COSMO CONSTRUCTION COMPANY
and the First National Bank & Trust
Company of Tulsa
v.
The UNITED STATES.
No. 44–69.

United States Court of Claims.
Nov. 12, 1971.

Joe Francis, Tulsa, Okl., attorney of record, for plaintiff.

Christine O. Cook, Washington, D. C. with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant J. Lawrence Heizmann, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFFS' MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to prepare and file his opinion on the issues of plaintiffs' motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on January 14, 1971, wherein such facts as are necessary to the opinion are set forth. A request for review by the court was filed by defendant and the case has been submitted to the court on the briefs of the parties and oral argument of counsel.

Since the court is in agreement with the opinion and recommendations of the commissioner, with modifications by the court, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, the cross-motions of the parties are allowed in part and denied in part as set forth in the "Conclusions of Law" hereto, with judgment entered accordingly.

Commissioner Spector's opinion, as modified by the court, is as follows:

The petition herein sets forth four causes of action based on contract. Each seeks judicial review of adverse decisions (ENGBCA Nos. 2785, 2786, 2787, and 2788, 67–2 BCA ¶ 6516) of the Department of the Army Corps of Engineers Board of Contract Appeals on contractor's four separate appeals filed under the standard "Disputes" clause contained in the contract.[1]

By contract dated February 23, 1962, Cosmo Construction Company (herein-after for convenience "plaintiff" or "Cosmo"), undertook the construction of "flood protection works" for the United States acting through its Army Corps of Engineers, along the Kansas River and Shunganunga Creek near Topeka, Kansas.

A more detailed description of the work reads: "construction of channel, pumping plant, drainage structures, relief wells, piezometers, and levee embankment, which includes, clearing and grubbing, stone slope protection, surfacing of levee crown, and seeding * *." It is a fixed price contract consisting of a unit price schedule of 63 items listing estimated quantities and unit prices. The total estimated contract price at time of award was $2,268,565.

The contract was to be completed within 700 days of a notice to proceed received on March 23, 1962, and this has been extended by 57 days for changes ordered by defendant, and an additional 144 days for delays acknowledged by defendant to be excusable. The work was completed and accepted by defendant on January 19, 1965.

### First Cause of Action—The Changed Conditions Claim

In a claim letter of July 29, 1965, setting forth a number of disputed items which arose during prosecution of the work, plaintiff summarized his claim of "Changed Conditions"[2] encountered "in the excavation area from station −(1+75) to station 85+00." The letter stated that the contract plans indicated that substantially all the material excavated from the area in question would be suitable for use in the planned embankments either adjacent to the point of excavation or within a minimum haul distance therefrom. This was the basis for plaintiff's bid, and was discussed

---

1. Worded to comply with the so-called Wunderlich Act, 68 Stat. 81 (1954); 41 U.S.C. §§ 321–322 (1964).

2. Article 4 of the contract promises an equitable adjustment in contract price and time of performance should the contractor encounter "(a) subsurface or latent physi-cal conditions at the site differing materially from those indicated in this contract, or (b) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract."

with the Government's representatives. In contrast "all or substantially all of the excavated material was determined to be not satisfactory for embankments by the authorized representative of the Contracting Officer and placement of the material in waste areas was directed. The placement of the excavated material in waste areas resulted in a much longer haul and greatly increased the cost of performing the excavation and disposal over what would have been experienced had the material been satisfactory as indicated."

Plaintiff also alleged that its inability to use excavated material for embankment required it to obtain new material from borrow pits located some distance away. All of these circumstances greatly increased the cost of this phase of the work, and plaintiff presented an exhibit showing overhaul of 65,483 yard-miles from excavation area to waste area, and overhaul of 336,000 yard-miles in transporting new material from borrow pits to embankment, plus the cost of 250,108 cubic yards of borrow material. The total claim alleged was in the amount of $216,236.07, with the related time adjustment claim to be held in abeyance, pending determination of other time adjustment claims to be later discussed. (*See* Fourth Cause of Action, *infra*.)

On June 17, 1966, the contracting officer denied the claim on the grounds "that the Government lacked timely notice, actual or constructive, of the asserted changed conditions except at station 75 + 00, and that the Government has been prejudiced by your failure to give the required timely notice." He continued: "I have not considered the merits of the claim, except as it pertains to conditions in the vicinity of station 75 + 00. This decision is not to be construed as a denial of the claim on its merits except as to the conditions in the vicinity of station 75 + 00." His adverse decision was duly appealed to the Chief of Engineers who is represented in these matters by a Board of Contract Appeals.

On appeal, the board observed.

Prior to hearing, the Government moved that we first hear and determine the question of lack of notice before hearing the dispute on its merits. We declined to do so because our review of the file convinced us that we would have to take extensive evidence as to the nature of the claim in order to resolve the notice question and that as a practical matter we should take evidence *on the merits of the claim* even though we might not reach that issue. The hearing *was conducted on that basis. We did not hear the question of quantum,* but of course we did receive evidence on quantities of suitable, wasted and wet materials anticipated and encountered since they have a bearing *on whether or not there was a changed condition.*
[Emphasis supplied.]

■ The foregoing is quoted with appropriate emphasis because it illustrates what this dispute is all about. It is, of course, customary to hear a case such as this on the merits (*i. e.*, the issue of liability), separate and apart from and prior to the issue of quantum, because the latter issue may be rendered academic if liability is not found to exist. If, on the other hand, liability is found, the issue of quantum is thereafter examined by less formal procedures. Our Rule 131(c) "Separate Determination of Liability," for example, typifies that customary practice when a trial is conducted in this court.

■ Of course, evidence on damages or quantum is not totally excluded, because there must be *some* evidence of damage to support a finding on liability.[3] But that limited evidence on damages is not of the quantity, quality, or precision necessary to support a judgment in a

---

3. This long-established rule is expressed as: "*Injuria absque damnum.* Injury or wrong without damage. A wrong done, but from which no loss or damage results, and which, therefore, will not sustain an action." Black's Law Dictionary, Revised Fourth Edition.

precise sum; it is only sufficient to demonstrate that the issue of liability is not purely academic; that some damage has been incurred.

█ That customary course of procedure is clearly programmed in the above quoted portion of the board's opinion. Unfortunately, it was not followed in the remainder of the decision. Plaintiff alleges that it was lulled into presenting only that minimal evidence on quantum sufficient to show that there was in fact a changed condition. But thereafter it received from the board a precise decision on quantum, a decision which is, in plaintiff's view, woefully insufficient and contrary to the evidence on quantum which it presented, and to the detailed evidence it could have presented, had it been aware that quantum was at issue. Moreover, and alternatively, it alleges that the board's determination on quantum was therefore based, quite naturally, on insubstantial evidence. It therefore constitutes a determination not entitled to finality, and one which should be overturned on this judicial review.

Plaintiff's complaint is valid, and its validity is illustrated by the remainder of the board's own opinion. In pertinent part, it found as follows:

* * * The contract drawings depict logs of 26 core borings in the claim area. Twelve of these are below Station 35 + 00 and all of these show clearly that this is an area that has been filled in by the dumping of various types of debris. A boring at Station 39 + 84 indicates a layer of asphalt just below the surface. *None of the other borings from this through Station 80 + 00 give any indication of debris.* [Emphasis supplied.]

There follows an extended discussion of where debris could have been anticipated, and where it could not have been foreseen, and a discussion of the extent to which the Government was put on notice or prejudiced by lack of notice of the plaintiff's alleged difficulties, following which the board expressed this ultimate conclusion:

The Government witnesses flatly denied that they had been given oral notice that appellant was contending that there was a changed condition at any place other than the vicinity of Station 75. We believe them. We also believe that appellant exaggerates the quantity of debris encountered between Stations 43 + 40 and 75 + 00 when its witnesses testified that practically all of that material was debris. One of its own officers mentioned a lens of debris. Obviously if all the material were debris, such a description would be inappropriate. Also, Government witnesses were able to ascertain from records made contemporaneously that 108,667 yards of material excavated between Stations 43 + 40 and 85 + 00 was used for embankment and only 72,656 yards wasted. Their *recollection* was that 13,131 of the latter quantity had to be wasted because it contained debris. The rest was wasted because it was too wet to use. Their testimony is that even some of the material containing debris was too wet for use and would probably have been wasted for that reason even if it did not contain debris. Appellant presents us with absolutely no quantity figures concerning the excavated material. Apparently no records were kept. We find this hard to reconcile with a claim that practically all this material was unsuitable because it contained debris.

* * * * * *

*We find no merit in the Government's contention that failure of notice prejudiced it in the sense that it was deprived of the opportunity to take remedial action.* None of its witnesses told us and we can not think on our own what remedial action might have been feasible. We do think that failure of notice has somewhat prejudiced the Government's ability to document conditions and be prepared to defend against the present claim.[4]

---

4. It is observed that this may equally prejudice the plaintiff in its ability to sustain its burden of proof.

Nevertheless, the Government has been able to establish from its records, *and we accept as a fact, that 13,131 yards of material excavated between Stations 43 +40 and 85 + 00 was unsuitable because it contained debris*. If we found, *as we do*, that this constituted a changed condition, *appellants should be compensated therefore*.

A study of the subsurface information by a prospective bidder would lead him to believe that the area between Stations −1+75 and 43+40 had been filled in with debris and that the material he would excavate from there would have to be wasted. The drawing information was reinforced by the specifications which said as much. *But the information is different for the area between 43+40 and 80+00. None of the borings taken in that area indicate that debris had been dumped there. The borings show natural ground. Also, the specifications which made it clear that the materials excavated between 00+00 and 43+40 was to be wasted were silent with respect to the claim area. A bidder would be justified in drawing a negative inference therefrom.* Nor do we think that a site investigation would have led a prospective bidder to conclude that he would encounter lenses of debris under ground. A few bottles and cans on the surface would tell nothing as to what would be found when the earth was excavated. Nor do we think it signifcant that only one of the borings was in the actual excavation. *The borings, all taken together, draw a picture of the general area and that picture here is one of natural ground, not lenses of debris.*

*The encountering of lenses of debris between Stations 43+40 and 80+00 constituted a changed condition calling for · an adjustment of the contract.* The Government witnesses testified that some portion *of the 13,131 yards of materials containing debris* was so wet that it would have been wasted anyway. *That material should be deducted* in assessing the impact of the changed condition. [Emphasis supplied.]

In net effect, the board found for plaintiff on the issue of liability and agreed that "changed conditions" had been encountered. On the Government's motion, it followed the usual practice of deferring the issue of quantum, and expressly so stated. But then it nevertheless made a determination on quantum, moreover, offering guidelines for computing deductions from that quantum determination.

Let there be no mistake that the finding that "13,131 yards of material * * was unsuitable because it contained debris" did in fact constitute a determination on quantum. The translation of that precise yardage finding into dollars, is relatively mechanical. Additionally, the direction to deduct wet material, deprived plaintiff of the opportunity of proving that it could have utilized wet material had it not been debris laden.

The decision on quantum was, therefore, a nullity. By reason of the rule in United States v. Carlo Bianchi & Co.,[5] plaintiff is not privileged to have that issue tried in this court; but that rule presupposes a hearing by the contracting agency,[6] a decision based on that hearing, and a review by the court of that decision measured against the hearing record. Here that record, limited to such minimal evidence on quantum as would in the board's words "have a bearing on

---

5. 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

6. The "Disputes" clause, referred to in the text at note 1 *supra*, guarantees the contractor an "opportunity to be heard and to offer evidence."

whether or not there was a changed condition," is both defective and inadequate to support any precise finding on quantum [7] and we must therefore stay this proceeding to afford the parties an opportunity to supply these defects or inadequacies.[8]

Plaintiff's motion for summary judgment should be granted; defendant's cross-motion should be denied. Further proceedings should be stayed pursuant to Rule 167 for a period of ninety (90) days to afford the parties an opportunity to obtain an agency resolution of the equitable adjustment in contract price to which plaintiff is entitled under the First Cause of Action.

### Second Cause of Action—Claim for Proper Classification of Certain Excavation

█ This claim grows directly out of a conflict in interpretation of the contract terms. Therefore, the board's adverse action on the claim essentially involves a decision on a question of law (mixed with some fact), is not entitled to finality,[9] and is subject to plenary consideration in this court.[10]

As mentioned at the outset, this is a fixed-price type of contract consisting of a unit price schedule of 63 items listing estimated quantities and unit prices. Two of these items deal with excavation in the following terms:

| Item No. | Description | Estimated Quantity | Unit | Unit Price |
|---|---|---|---|---|
| * | *     *     * | *     * | * | * |
| 2 | Common Excavation ........ | 1,670,400 | cu. yd. | 0.39 |
| 3 | Unclassified Excavation: | | | |
|   | a.   First 56,000 cu. yds. .. | 56,000 | cu. yd. | 1.25 |
|   | b.   Cubic Yards in Excess of 56,000 ........ | 60,000 | cu. yd. | 1.25 |
| * | *     *     * | *     * | * | * |

The issue in this Second Cause of Action is whether excavation for five drainage ditches and nine rock dikes should be categorized as "common," and paid for at $0.39 per cubic yard; or as "unclassified" and paid for at $1.25 per cubic yard. The problem is exacerbated because the words "common" and "unclassified" are normally not used to describe contrasting types of excavation, but are rather words of similar meaning.[11] Thus in construction work, either "common" or "unclassified" might be used to describe ordinary excavation, in contrast to a specific classification like "rock,"

or "boulders," or "hardpan," for example. This and other provisions hereinafter quoted, raise the issue of whether or not the defendant, which drafted these provisions, has created an ambiguity; and as a correlary to that, whether or not plaintiff's interpretation of these provisions is a reasonable one. The parties agree that if the excavation in question should be categorized as "unclassified," plaintiff is entitled to recover $128,478.84, plaintiff having been paid for such excavation as "common," under protest.

7. Cf. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 431, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

8. See Bianchi, note 5 *supra*, 373 U.S. at 718, 83 S.Ct. 1409.

9. See note 1 *supra*, 41 U.S.C. § 322 (1964 ed.).

10. Paccon, Inc. v. United States, 399 F.2d 162, 168–169, 185 Ct.Cl. 24, 35 (1968). See also Morrison-Knudsen Co. v. United States, 397 F.2d 826, 840–841, 184 Ct.Cl. 661, 684 (1968).

11. In ordinary parlance (apart from construction engineering), "common" is defined as "of ordinary occurrence or appearance; familiar * * * Of the usual type"; and to "unclassify" is to divest of "classification," which is "the systematic arrangement in classes." Webster's New Collegiate Dictionary.

Other provisions of the specifications are helpful, but also further confusing. Section 2 "Excavation" provides in paragraph 2–01 "Scope" that "[t]his section covers excavation *except excavation for structures,* complete." (Emphasis supplied.) Paragraph 2–04 "Excavation *b.*" reads: *"Channels, relief well collector ditch, and drainage ditches,* including any excavation necessary for the placement of stone protection, shall be excavated at the locations and to the cross sections and grades shown on the drawings," and *"c"* reads: *"Inlet and outlet ditches* to drainage structures shall be excavated at the locations and to the cross sections and grades shown on the drawings."

Paragraph 2–06 *"Removed of Objectionable Material a. General"* reads:

The Contractor shall excavate, from the ground to be occupied by the levee, any materials, including soft, low shear strength clays, creek muck, trash fill and deleterious deposits which the Contracting Officer may consider objectionable in such locations from a standpoint of stability or permeability. Removal of objectionable material will not be required outside the limits of the projected levee slope.

Paragraph 2–11 *"Payment a. General"* is as follows:

The cost of all plant, labor, equipment, and material required to perform the work specified in this section, *except that portion of the work specified for removal of objectionable material,* shall be included in the contract unit price per cubic yard for "Common Excavation." Materials excavated and placed in required embankments other than waste areas will also be paid for as specified in section EMBANKMENT. [Emphasis supplied.]

Paragraph 2–11*d.* "Removal of Objectionable Material" reads:

The cost of furnishing all plant, labor, and incidentals necessary for the removal of objectionable materials specified in this section of the speci-

fications, shall be included in the contract unit price per cubic yard for "Unclassified Excavation, a. first 56,-000 cu. yd., b. cubic yards in excess of 56,000."

Then there is also Section 8 "Earthwork for Structures." Paragraph 8–01 *"Scope"* reads:

This section covers *excavation* and backfill required *for construction of drainage structures,* and filling or removing existing sewers and waterlines under the levee, complete. [Emphasis supplied.]

And Paragraph 8–08 *"Payment"* reads:

The cost of all plant, labor, and material required to perform the work described in this section shall be included in the *applicable* contract unit price for the items listed below. No separate payment will be made for items for which measurement has not been provided, and all costs in connection with these items shall be included in the applicable contract unit prices for the items to which they pertain. [Emphasis supplied.]

| *Description* | *Unit* |
|---|---|
| "Unclassified Excavation | |
| a. First 56,000 cu. yd. | cu. yd. |
| b. Cubic yards in excess of 56,000" | cu. yd. |
| "Common Excavation" | cu. yd. |

\* \* \* \* \* \*

Paragrah 8–03 *f.* *"Objectionable Material"* reads:

Where objectionable material as defined in section EXCAVATION, extends below a proposed structure, such material shall be removed to firm subsoil as directed. The overexcavated space below the structure shall be backfilled with impervious material in accordance with section EMBANKMENT. The removal and disposal of the objectionable material and replacement of the backfill shall be accomplished as specified in paragraph 3–05a(2).

Referring to paragraph 2–01, quoted above, the five drainage ditches in question may not be "structures," in the nar-

rowest definition,[12] but without these five drainage ditches the structures connected thereto are useless. Therefore, excavation for these five drainage ditches would appear to be "excavation for drainage structures." [13]

Nor does this render meaningless paragraph 2–04c. quoted above dealing with "[I]nlet and outlet ditches to drainage structures" because there are drainage ditches other than the "structure" ditches in question to which paragraph 2–04c. could be deemed to apply, such as the outlet ditches at stations 507 and 601+75, which were not adjunct to any structure. Thus, since section 2 "Excavation" does not apply to "excavation for structures," such as the five drainage ditches in question, it would appear that section 8 "Earthwork for Structures" would apply.

Paragraph 8–08 of that section, quoted above, states that work performed thereunder shall be paid for at the "applicable" unit price, thereafter reciting both the "unclassified" and "common" excavation items, without offering any further assistance on which would be "applicable."

Faced with this "can of worms," the hearing before the board resorted also to trade usage for a definition of "common excavation." [14] The board accepted a definition given by plaintiff's expert witness that "common" excavation in the construction industry is:

> * * * excavation that can be performed by wheel or other type of excavating equipment or in cases with a dragline, but *whenever you get into excessive moisture, shrinkage or sloping banks that cave*, that gets out of the realm of common. [Emphasis supplied.]

Observe also from paragraph 2–11d., quoted above, that the removal of "objectionable material" is to be paid for at the unit price for "unclassified excavation." Since paragraph 8–03f., above, also treats with "objectionable material" and paragraph 8–08 speaks of payment for excavation under section 8 at the "applicable" unit price, listing "unclassified excavation" as one of these, one should reasonably surmise that "objectionable material" in section 8, falls under the description of "unclassified" excavation. Although there is some evidence in the administrative record that plaintiff used a dragline in excavating these ditches, and did not do any shoring, sheeting or bracing to prevent possible cave-ins, there is uncontroverted evidence that plaintiff encountered sandy material at each of the locations for these ditches, causing plaintiff to have to excavate twice as much material as it would have to excavate had the material been firm. It was then required to backfill with impervious material to prevent cave-ins.

Also, although it is disputed as to how much water was encountered in connection with excavation of the ditches in question, it is undisputed that plaintiff encountered water in the ditch at station 220+00, where 83.72 percent of the excavation for these ditches occurred.

■ All of the foregoing considered, plaintiff's argument that these are "structures" (see par. 2–01, *supra*); that the material involved would be defined as "objectionable material" (see par. 2–11d., *supra*); and that it was material that was excessively moist and had a tendency to slope and cave (see the "trade usage" definition quoted above); all support the conclusion that it was to be paid for as "unclassified excavation."

12. "Structure" is defined in Webster's New Collegiate Dictionary as: "1. Manner of building; form; construction. 2. Something constructed or built, as a building, a dam, a bridge * * *."

13. Note also that the general description of the contract, as earlier quoted, is one

for "construction of * * * drainage structures * * *."

14. *Cf.* Gholson, Byars & Holmes Constr. Co. v. United States, 351 F.2d 987, 999–1000, 173 Ct.Cl. 374, 395 (1965), a case in which "trade usage" was deemed relevant even where no ambiguity was present, as there is in this case.

Even were this not the preponderant interpretation, the very spelling out of the above conflicts, and vagueness, illustrates an ambiguity, and since defendant drafted the contract and plaintiff's interpretation is a reasonable one, it is entitled to prevail.[15]

To the extent that subordinate findings of fact by the board contribute to its contrary interpretation, they are not supported by substantial evidence. Plaintiff is entitled to recover $112,106.16[16] by reason of the proper characterization of the excavation for the ditches as "unclassified" excavation.

■ The excavation for the nine rock dikes in question presents a different picture. The parties and the board's decision all agree that section 8 alone applies here because the dikes are "structures." But this excavation involved neither "objectionable material," nor did it correspond in appearance to the trade usage definition of unclassified material above quoted. The only evidence tending to indicate that this excavation was not "common," was that four of the nine dikes were close to the river bank, requiring that equipment be kept back from the edge to prevent cave-ins. While plaintiff had, perhaps, to take somewhat more time and care than normal, this alone is insufficient to suggest that the "applicable" unit price listed in section 8 would be that for "unclassified" excavation.

In contrast, the evidence is undisputed (applying the trade usage definition of "common excavation" above), that plaintiff excavated for these nine dikes with a dragline, and performed no shoring, bracing or dewatering with respect thereto. By way of a contemporaneous interpretation, it is also noteworthy that plaintiff accepted without protest, the "common" excavation price of $0.39 per cu. yd. for an additional rock dike, not required by the original contract.

In summary, the board's finding that excavation for the nine rock dikes should be paid for at the lesser unit price assigned to "common" excavation, is supported by substantial evidence, and is correct as a matter of law.

Plaintiff's motion for summary judgment with respect to the five drainage ditches should be granted, and defendant's cross-motion to that extent should be denied. Judgment should therefore be entered for plaintiff in the sum of $112,106.16. In all other respects, plaintiff's motion for summary judgment should be denied, defendant's cross-motion for summary judgment should be granted and the petition on this Second Cause of Action dismissed.

*Third Cause of Action—Claim for Removing or Filling Sewers and Waterlines (Constructive Change)*

■ Fundamentally, this cause of action also grows out of a conflict in interpretation of the contract terms, resulting from a most regrettable lack of clarity and precision in the contract drawings and specifications. The

15. The rule of *contra preferentum. See,* for example, Tecon Corp. v. United States, 411 F.2d 1262, 188 Ct.Cl. 15 (1969); D & L Constr. Co. and Associates v. United States, 402 F.2d 990, 185 Ct.Cl. 736 (1968); Sundstrand Turbo v. United States, 389 F.2d 406, 182 Ct.Cl. 31 (1968); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963); and Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390 (1947).

16. *Excavation for Drainage Ditches:*

| | | Cubic Yards |
|---|---|---|
| 204+90 to 237+70 | Well Collector Ditch | 12,226 |
| Structure 220+00 | Inlet & Outlet Channel | 109,132 |
| Structure 241+30 | Inlet Ditch | 928 |
| 261+00 to 280+00 | Drainage Ditch | 2,242 |
| Seward Road | Inlet & Outlet Ditch | 5,828 |
| Total | | 130,356 |

($1.25/cu. yd. less $.39/ cu. yd., the price for "common" excavation) times 130,356 cu. yd. = $112,106.16.

board's adverse decision, therefore, is essentially one on a question of law, and subject to plenary consideration on judicial review.[17]

Section 8 of the specifications "Earthwork for Structures" (which was involved in the Second Cause of Action), is also involved here, but in another context.

Paragraph 8–01 *"Scope"* provides in pertinent part:

This section covers * * * filling or removing *existing* sewers and waterlines *under the levee*, complete. [Emphasis supplied.]

Paragraph 8–06 *"Existing Abandoned Sewers and Waterlines a. General.,"* provides as follows:

*Abandoned* sewers and waterlines including manholes and valve boxes shall be removed or filled and plugged *within the limits of the levee foundation as shown on the drawings.* All such structures shall be removed riverward of a point 10 feet below the riverside levee slope, where they extend within the limits of excavated areas and for a minimum distance of two feet riverward of the landside limit of removal or filling and plugging. Manholes and valve boxes within the limits of the levee foundation shall be removed down to the top of the adjacent pipe. A concrete plug shall be installed at the riverward and landward ends of the pipe remaining in place under the levee and in the pipe remaining in place landward of the levee. *All known sewers and waterlines to be removed or filled are shown on the drawings. In the event that additional sewers or pipes are discovered under the levee foundation, they shall be removed or filled and plugged, as directed, and payment therefor will be made under clause 3 of the General Provisions.*[18] Remov-

al or filling of existing 10-inch, 12-inch, and 14-inch pipes in the vicinity of levee station 5+40 shall be coordinated with the excavation and filling operations of the AT&SF Railroad Company. [Emphasis supplied.]

Paragraph 8–08 *"Payment"* provides in pertinent part:

The cost of all plant, labor, and material required to perform the work described in this section shall be included in the applicable contract unit price for the items listed below. No separate payment will be made for items for which measurement has not been provided, and all costs in connection with these items shall be included in the applicable contract unit prices for the items to which they pertain.

| Description | | | | Unit |
|---|---|---|---|---|
| * | * | * | * | * |
| "Removing or Filling *Existing Abandoned* Sewers & Waterlines." [Emphasis supplied.] | | | | lump sum |

This is item 14 on the earlier mentioned Unit Price Schedule of 63 items. Plaintiff's lump sum bid for "[r]emoving or filling *existing abandoned* sewers and waterlines" was $10,700.

At issue in this Third Cause of Action are 13 sewer or waterlines removed or filled by plaintiff at the direction of defendant, under protest, and without additional compensation.[19] The conflict arises over the question of whether *"existing abandoned* sewer and waterlines" (emphasis supplied), means those abandoned at the time plaintiff submitted its bid, or, in addition, those abandoned at any time before the contract was completed. The parties have stipulated that if plaintiff's interpretation is correct, it is entitled to receive $9,452.13 under the "Changes" clause.

Plaintiff contends that his bid on item 14 quoted above, applies only to sewer and waterlines labeled "existing aban-

---

17. *See* notes 9 and 10 *supra.*

18. This is the standard "Changes" clause providing for an equitable adjustment in contract price for extra work, not covered in the original contract.

19. *See* par. 8–06 of specifications, and note 18 *supra.*

doned" on the contract drawings on which bids were invited; that the portrayal on the drawings of sewer and waterlines other than those designated "existing and abandoned," was solely to alert bidders to the need for scheduling operations so as to create the least interference with these facilities. Plaintiff further contends that the sentence on sheet 13 of the drawings to the effect that "[e]xisting utilities within the construction limits will be removed or relocated as required *by others*" (emphasis supplied), supports this position.

In rebuttal, defendant argues that the word "utilities" in this last quoted sentence on sheet 13, does not include sewers and waterlines. There are items on the drawings other than the 13 sewer and waterlines in dispute which bear the specific notation that they will be done by others. There is no such *specific* notation (other than the general reference to "utilities" on sheet 13) with respect to these 13 lines at issue.

Two waterlines only are described on the drawings as "existing abandoned," and therefore plaintiff contends that paragraph 8–06, quoted above, and corresponding item 14, quoted above from the unit price schedule, apply only to the two waterlines. These two waterlines bear the further notation "that they will be permanently closed by others." None of the 13 sewer and waterlines in dispute, is described on the drawings as "abandoned." There are many items on the drawings other than the 13 lines in question which bear solely the notation "existing." Notations pertaining to each of the 13 lines in dispute indicate that they are to be removed, plugged or filled. There are sewer and waterlines other than the 13 in dispute, which the drawings indicate are to be removed or filled, and which further specify by whom.

The 13 sewer and waterlines in controversy are shown on the drawings as located within the levee foundation, whereas the two waterlines plaintiff contends were the only ones "existing and abandoned" and therefore covered by unit price item 14, are located outside the levee foundation. The board did not resolve a dispute in the testimony as to whether or not plaintiff did actually remove the two waterlines which it contends are the only ones to be removed under pay item 14.

In the face of this second "can of worms," plaintiff's argument has initial plausibility. It is that the phrase "Removing or Filling Existing Abandoned Sewers and Waterlines" would mean sewers and waterlines existing and abandoned when bids were solicited, and not those subsequently to be abandoned in the course of construction. But this is not a reasonable interpretation in the face of all the provisions of the contract, and other existing circumstances.

The scope paragraph of section 8 (8–01), speaks of existing sewers and waterlines *under the levee*. Paragraph 8–06, on existing abandoned sewers and waterlines, also provides that "[a]bandoned sewers and waterlines * * * shall be removed or filled and plugged *within* the limits of the *levee foundation* as shown on the drawings," (emphasis supplied), and that "[a]ll known sewers and waterlines to be removed or filled are shown on the drawings."

In summary, paragraphs 8–01 and 8–06 make it reasonably clear that the sewer and waterlines to which they refer are located beneath the levee in question. There are no sewer and waterlines specifically marked "existing and abandoned" which are within the levee foundation. However, all 13 of the sewer and waterlines in dispute are marked on the drawings as lines to be removed, filled or plugged, which would certainly indicate they are to be abandoned. And while other items on the drawings bear the notation that they will be removed "by others," the 13 items in question bear no such negative notation, inferring that plaintiff is to effect their removal.

Furthermore, plaintiff's interpretation that only two waterlines fall within paragraphs 8–01 and 8–06 (and unit price item 14), is unreasonable because these waterlines are outside the levee founda-

tion, bear the notation that they "will be permanently closed by others" (inferring that they are not plaintiff's responsibility), and do not include sewers which are mentioned along with waterlines in paragraphs 8–01 and 8–06. This last point would render the reference to "sewers" in these provisions meaningless, under plaintiff's interpretation.[20]

Nor is plaintiff's argument based on the note on sheet 13 that "[e]xisting utilities within the construction limits will be removed or relocated as required by others" as plausible as might first appear. Certainly sewer and waterlines are "utilities" in the generic sense. But read in total context, it is apparent that the note was meant to apply to utilities to be continued in service, rather than those to be abandoned. There are sewer and waterlines and manholes within the levee foundation which bear *only* the notation "existing" or the notation that the work required would be done by others, confirming that these were the utilities mentioned in the above quoted note on sheet 13.

Although the conflict involved in this Third Cause of Action might be deemed an ambiguity,[21] it was so glaring an ambiguity as to create a duty on the part of plaintiff to seek clarification. Having failed to do so, it must now have the contract construed as it stands, without the benefit of a penalty imposed [22] upon the drafter of the contract. Defendant's interpretation of the contract is the more plausible one, and it is to be preferred to that offered by plaintiff. Therefore, its claim on this Third Cause of Action should be denied.

Plaintiff's motion for summary judgment should be denied, defendant's cross-motion for summary judgment should be granted, and the petition on this Third Cause of Action dismissed.

*Fourth Cause of Action—Claim for Time Extensions and Remission of Liquidated Damages*

General Provision 5 "Termination for Default-Damages for Delay-Time Extensions" provides in pertinent part as follows:

(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. Whether or not the Contractor's right to proceed with the work is terminated, he and his sureties shall be liable for any damage to the Government resulting from his refusal or failure to complete the work within the specified time.

\* \* \* \* \* \*

(c) *If fixed and agreed liquidated damages are provided in the contract* and if the Government does not so terminate the Contractor's right to proceed, *the resulting damage will consist of such liquidated damages* until the work is completed or accepted.

(d) The Contractor's right to proceed shall not be so terminated *nor the Contractor charged with resulting damage if:*

(1) The *delay* in the completion of the work arises from unforeseea-

---

20. *Cf.* Morrison-Knudsen Co. v. United States, 397 F.2d 826, 184 Ct.Cl. 661 (1968) ; Gelco Builders & Burjay Const. Corp. v. United States, 369 F.2d 992, 177 Ct.Cl. 1025 (1966), and cases cited therein.

21. *Cf.* note 15 *supra.*

22. The *contra preferentum* rule, note 15 *supra.*

ble *causes beyond the control and without the fault or negligence of the Contractor,* including but not restricted to, acts of God, acts of the public enemy, acts of the Government in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, or delays of subcontractors or suppliers arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and such subcontractors or suppliers; and

(2) The Contractor, within 10 days from the beginning of any such delay (unless the Contracting Officer grants a further period of time before the date of final payment under the contract), notifies the Contracting Officer in writing of the causes of delay.

In the Invitation for Bids the above quoted provision is amended as follows:

Paragraph (d) of Clause 5 of the General Provisions is amended *by deleting the word "unforeseeable"* and inserting the phrase "other than normal weather" after the word "causes" in lines 2 and 10 of subparagraph (1).

Special Condition SC–2 "Liquidated Damages" provides as follows:

In case of failure on the part of the Contractor to complete the work, except seeding, within the time fixed in the contract *or any extensions thereof,* the Contractor shall pay the Government *as liquidated damages the sum of $300 for each calendar day of delay* until the work, except seeding is completed or accepted. [Emphasis supplied in all foregoing quotations.]

There are several claims for time extensions involved in this Fourth Cause of Action. Defendant has withheld $300 per day for 95 days, or $28,500. Plaintiff's claims for various time extensions,

and remission of this total sum are taken up in turn. Note that there is also a time extension claim in connection with the First Cause of Action, *supra* to be resolved in the course of a stay of proceedings on that cause.

■ At issue in the first claim hereunder, is the meaning of Special Condition SC–7 "Variation in Estimated Quantities." Therefore, this claim also presents an interpretive problem and essentially a question of law subject to *de novo* consideration.[23] The provision reads in pertinent part, as follows:

*a.* Where the *quantity* of a pay item in this contract is an *estimated quantity* and where the *actual quantity* of such pay item, other than any item listed in *b* below is *more than 115% or less than 87% of the estimated quantity stated in this contract,* as modified, *an equitable adjustment* in the contract *price* shall be made upon demand of either party. For *overruns* the equitable adjustment *shall be limited to the number of units by which the actual* quantity *exceeds 115% of the estimated* quantities. Where the actual quantity of any pay item is *less than 87%* of the estimated quantity stated in this contract, the final payment will be computed by applying *the contract unit price to 87% of the estimated quantity* shown in the contract *and then deducting from the result an amount obtained by applying to the number of units of underrun below 87%* of the estimated quantity *a negotiated price per unit of such underrun.* The unit price for *deduction shall represent the reasonable cost to the Contractor of performing the units of work exclusive of the mobilization and other fixed costs relating thereto.* [Emphasis supplied.]

\* \* \* \* \* \*

*d.* If any item within the scope of subparagraph *a,* above, is *more that 105% or less than 96%* of the *estimated quantity stated in the contract* \* \* \* and *if such variation causes*

---

23. *See* notes 9 and 10 *supra.*

*an increase or a decrease in the time required for performance of this contract the contract completion time will be adjusted as follows:*

(1) *If the quantity variation is such that it will cause an increase* in the time necessary for completion, *the Contracting Officer shall* * * * ascertain the facts and *make such adjustment* for extending the completion date *as in his judgment the findings justify.* [Emphasis supplied.]

It will be observed from the above quotation that the provisions for *price* adjustment (subdivision *a.*), and those for *time* adjustment (subdivision *d.*), in the event of a variation from the estimated quantity, are not the same. Plaintiff urges therefore that they were intended to operate differently. In each case (price or time), an adjustment is to be made if "triggered" by a variation of a specified degree (115 percent—87 percent in the case of price adjustment; and 105 percent—96 percent in the case of a time adjustment). But, if there is an overrun, in excavation, for example, the contractor is not totally uncompensated for the additional excavation above the amount specified in the unit price schedule. He is, of course, paid the contract unit price which he bid until the "trigger" point of 115 percent of estimated quantity is reached. At that point the unit price is adjusted upward or downward for amounts exceeding 115 percent of the original estimate.

Similarly a time adjustment is "triggered" when the estimated quantity in the unit price schedule exceeds 105 percent; but if the contractor is not given a time extension for the additional work performed between 100 percent (as estimated), and 105 percent when the 105 percent point is reached a penalty in the form of liquidated damages is imposed for the late performance of that 5 percent of the work. That is why plaintiff urges that SC–7d., above, dealing with time, in contrast to SC–7a., dealing with price, does *not state* that "the equitable

adjustment shall be limited to the number of units by which the actual quantity *exceeds* 115% of the estimated quantities." [Emphasis supplied.]

The actual quantities of excavation exceeded estimates by 93,146 cubic yards. The total yardage excavated was 105.18 percent of estimates. Similarly, as to other pay items, the actual quantity of bedding and riprap work exceeded the amounts estimated in the payment schedule for this work by 27,526.7 cubic yards. This represented 114.83 percent of estimates.

Plaintiff's average rate of excavation was 1,901.7 cubic yards per day. Its average rate of bedding and riprap production was 296.5 cubic yards per day. Defendant did not allow plaintiff any additional time for contract performance on account of the excavation overrun. It allowed plaintiff a 36-day time extension for performance of bedding and riprap work only in excess of 105 percent of estimated quantities.

The interpretation of SC–7d. above urged by plaintiff is the more persuasive interpretation, and also the one most consistent with reality. Defendant drafted SC–7. It drafted subdivision *a.*, dealing with *price* adjustment in the event of variation in quantities, quite differently than it drafted subdivision *d.*, which dealt with *time* adjustment within the same article. These essential differences in language cannot be ignored. Even assuming, *arguendo*, that they could, plaintiff's interpretation is a reasonable one (in fact the more reasonable one) and it would be entitled to that interpretation in any event under the rule of *contra preferentum.*[24]

A difference in the treatment of price and time adjustments is also supported by logic and practical considerations, as urged by plaintiff. In both subdivisions *a.*, and *d.*, adjustments of price and time are "triggered" in effect when overruns or underruns in a specified percentage are encountered. But in the case of price adjustment, the contractor is never

---

24. *See* note 11 *supra.*

uncompensated for work performed, in the event of a variation in estimated quantities. It receives the contract unit price which it bid, in this case up to a 115 percent overrun; and then an adjusted unit price (ordinarily a downward adjustment in the case of an overrun) for the quantities in excess of 115 percent.

Time adjustment on the other hand deals with the quite different question of whether defendant may assess liquidated damages, as an incentive for timely performance. The contractor is to be relieved of this penalty if delayed for reasons beyond its control and without its fault or negligence. The need to perform extra work beyond that specified in the contract certainly falls within that definition.[25] This would explain the difference in language between subdivisions *a.* and *d.* of SC–7 which defendant drafted, and would support a time adjustment for the full amount of the overrun beyond 100 percent of the work originally estimated to be performed. Plaintiff is entitled to such an adjustment, and a corresponding remission of liquidated damages withheld.

■ The second claim for time extension raises the issue of whether plaintiff's contract performance was delayed by reason of a suspension order issued May 13, 1964, by the contracting officer with regard to work and procurement on certain relief wells. The suspension order was not lifted until July 9, 1964, when modification No. 35 was issued making changes in connection with the wells.

The board found that this suspension order did not cause a delay in overall performance. Plaintiff's construction supervisor had testified that the equipment employed on the suspended work, was diverted to other contract work; but that plaintiff had to delay certain work until the suspension order was lifted. Defend-

ant's chief inspector and its project engineer offered the opinion that the suspension order did not delay overall performance, and that plaintiff did not demobilize its equipment by reason of the suspension order.

Although there is some evidence that by reason of the suspension order the work was performed in a somewhat different sequence than originally contemplated, there is substantial evidence for the board's factual conclusion that overall performance was not thereby affected.[26] Plaintiff is not entitled to a time extension (and corresponding remission of liquidated damages) by reason of the suspension order.

■ The third and last claim for time extension in this Fourth Cause of Action results from the refusal of the defendant to extend the contract completion date by reason of its issuance of three change orders: No. 35 (changes in the relief wells); No. 39 (removal of silt deposited by a heavy rain); and No. 41 (filling of areas eroded by heavy rain). As to this claim, the entire decision of the board reads as follows:

* * * Appellant contends that issuance of a modification for extra work automatically serves as a starting point for establishing the contract completion date and extends contract completion time from that point for the period of time required to complete the modification work without regard to the causal effect performance of the modification work has on over-all contract completion. Under this theory a contractor's unexcused delayed performance would force the Government with choice as between surrender of either of its contract conferred rights of making changes or of being made whole for unexcused late performance. We have considered this theory before and rejected it. See Independent Contractors and Engineers,

25. See GP–5, earlier quoted.

26. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456

(1951); and Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

Eng BCA No. 1922, Dec., 1 June 1961. We reaffirm the rationale of that decision.

Its own prior opinion in *Independent Contractors,* which the board cites in the opinion quoted above, is unpublished. Examination of a copy thereof requested from the agency, illustrates that *Independent Contractors* involved different facts and that there was essentially no issue of fact in that case, but rather a contract interpretation problem.

In any event, the issue in the case before us, is simply this. The standard, Government-wide mandatory "Changes" clause in this contract provides in pertinent part that the contracting officer may issue change orders and: "[i]f such changes *cause* an increase or decrease in the Contractor's cost of, *or time required for, performance of the contract,* an equitable adjustment *shall be made* and the contract modified in writing accordingly." [Emphasis supplied.] In the decision quoted above, the board has simply not confronted the issue of fact in the case, namely, whether the three change orders in question "caused" an "increase" in the "time required for performance of the contract"; and the standard "Changes" clause mandates a confrontation of that issue. If the board's purpose in relying simply on its own prior decision in *Independent Contractors* was to infer that it can nullify the standard "Changes" clause provisions elsewhere in the specifications, or otherwise, that is an incorrect conclusion of law.[27]

However, if all that the board meant is that the contractor is not entitled to a time extension on account of these three change orders (Nos. 35, 39, and 41) unless plaintiff shows that these changes caused an actual increase in the overall performance time, then the board was correct as a matter of law, but it failed to determine whether such an actual increase in overall performance time was caused by these particular change orders.

The case must go back to the agency for a determination of that precise issue.

Plaintiff's motion for summary judgment should be granted with respect to the first and third claims for time extensions and remission of liquidated damages, and defendant's cross-motion to that extent should be denied. In all other respects, plaintiff's motion for summary judgment should be denied, defendant's cross-motion should be granted and the petition on this Fourth Cause of Action dismissed. Further proceedings should be stayed pursuant to Rule 167 for a period of ninety (90) days to afford the parties an opportunity to obtain an agency resolution of the equitable adjustment to which plaintiff is entitled under this Fourth Cause of Action.

## CONCLUSIONS OF LAW

### First Cause of Action

Plaintiff's motion for summary judgment is granted, and defendant's cross-motion is denied. Further proceedings are stayed pursuant to Rule 167 for a period of ninety (90) days to afford the parties an opportunity to obtain an agency resolution of the equitable adjustment to which plaintiff is entitled, consistent with the opinion as it relates to this cause of action.

### Second Cause of Action

Plaintiff's motion for summary judgment with respect to the five drainage ditches is granted, and defendant's cross-motion to that extent is denied. Judgment is entered for plaintiff in the sum of $112,106.16. In all other respects, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition as it relates to this cause of action, is dismissed.

### Third Cause of Action

Plaintiff's motion for summary judgment is denied, defendant's cross-motion

---

27. *Cf.* Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914). *See also,* A. Brindis Co., GSBCA No. 3085, 70-2 BCA ¶ 8527.

for summary judgment is granted, and the petition on this cause of action dismissed.

*Fourth Cause of Action*

Plaintiff's motion for summary judgment is granted with respect to the first and third claims for time extensions and remission of liquidated damages, and defendant's cross-motion is, to that extent, denied. In all other respects, plaintiff's motion for summary judgment is denied, defendant's cross-motion is granted and the petition on this cause of action dismissed. Further proceedings are stayed pursuant to Rule 167 for a period of ninety (90) days to afford the parties an opportunity to obtain an agency resolution of the equitable adjustment in time, and remission of liquidated damages, to which plaintiff is entitled under this cause of action.